## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Jessica Biggs, | |
| Plaintiff, | |
| | Case No. 18-cv-6183 |
| v. | |
| | Judge Mary M. Rowland |
| Chicago Board of Education, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jessica Biggs served as an assistant principal on an at-will basis for Defendant Chicago Board of Education. In 2018, Defendant terminated Plaintiff after finding that she violated two school policies relating to transportation of students and attendance. Plaintiff then brought suit against Defendant under 42 U.S.C. § 1983, alleging that Defendant violated her Fourteenth Amendment due process rights to continued employment and occupational liberty. Defendant has moved for summary judgment [97]. For the reasons explained below, this Court grants Defendant's motion.

## I.      Background

As a preliminary matter, Defendant has moved to strike some of Plaintiff's responses to Defendant's statements of fact and some of Plaintiff's statements of additional fact, arguing that they fail to comply with the Federal Rules of Evidence and this district's Local Rules in various ways. [124] at 1–5. This Court maintains broad discretion to enforce the local rules governing summary judgment

1

motions, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

First, Defendant has moved to strike Plaintiff's response to paragraphs 10, 11, 22, 26, 31, 33, 35, 37, 49, 54, 60, 65, and 74 to Defendant's statements of fact because they contain denials unsupported by any citation. This Court has reviewed those responses and agrees that some of those responses—paragraphs 22, 26, 31 and 33-- contain partial denials to Defendant's statements without supporting citations. "Simply denying a fact that has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (quoting *Roberts v. Advocate Healthg Care*, 119 F.Supp.3d 852, 854 (N.D. Ill. 2015)), *aff'd*, 926 F.3d 409 (7th Cir. 2019). This Court will therefore disregard these partial denials and deem Defendant's corresponding statements of fact admitted. *Id.*

This Court, however, declines Defendant's request to strike Plaintiff's responses to paragraphs 21, 25, 35, 37, and 69 of Defendant's statement of facts and Plaintiff's additional facts in paragraphs 2, 7–10, 12–16, 21, 23, 26–31, and 35. *See* [124] at 2. Defendant argues that the exhibits cited in these paragraphs do not support Plaintiff's asserted responses or additional facts. But this Court can evaluate these on a case-by-case basis and thus will not strike them wholesale. This Court similarly declines to strike Plaintiff's responses to paragraphs 10, 21, 22, 29, 30, 36, 49, 51, 60, 74, and 77 and paragraphs 1, 3, 7, 9, 17–21, and 24 from Plaintiff's statement of additional facts. [121] at 2. Defendant argues that these paragraphs fail

to create a genuine dispute and/or are immaterial to the issues in this case, [121] at 2, but again, this Court can evaluate them on a case-by-case basis, *see, e.g.*, *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1020 (N.D. Ill. 2018) ("Rather than attempt to winnow the voluminous statements to only material paragraphs in the abstract, the court again deems addressing materiality questions as they pertain to particular issues to be the better course because it may obviate the need to analyze each disputed paragraph."). For the same reasons, this Court declines to strike five exhibits that Plaintiff attempts to introduce in her effort to defeat summary judgment. [124] at 2. To the extent these exhibits are material to the analysis, this Court will address them below.

With Defendant's motion to strike resolved, this Court turns now to the facts of this case, which come from Defendant's statement of facts [99], Plaintiff's statement of additional facts [116], and their respective responses [114]; [125].

## A.    Plaintiff's Employment and CPS Rules

Defendant employed Plaintiff as interim principal of Burke Elementary School, a Chicago Public School, from July 17, 2012 to June 29, 2018. [99] ¶ 1. Defendant is a municipal body organized pursuant to the Illinois School Code to maintain Chicago Public Schools (CPS). *Id.* ¶ 2. CPS is divided into subdistricts or "networks" which group schools together by geographical location. *Id.* ¶ 4. During the 2016–17 and 2018–19 school years, Burke was in Network 9 and Felicia Sanders served as the Chief of Schools for Network 9. *Id.*

Plaintiff served as an at-will employee. *Id.* ¶ 5. As principal, Plaintiff's duties included knowing and understanding CPS Policy and Board Rules and ensuring her staff members followed such rules and policies. *Id.* ¶ 6.

### B.  Student Travel Policy

CPS Policy Section 604.3 relating to student travel provides:

B. Private Vehicles Use - Use of private vehicles for student trips is strongly discouraged. However, when use of a private vehicle is the only feasible method of travel, such vehicles may be used only if the total number of passengers per vehicle (including the driver) is ten (10) or fewer and the following requirements are met: 1. The private vehicle must be a motor vehicle designed to carry no more than ten (10) passengers (including the driver), with functioning seatbelts for each person; 2. No more passengers (including the driver) may be transported in the private vehicle than the vehicle was designed to carry; and 3. Any person requesting to transport students in a private vehicle must receive prior written approval from the principal and the parents or legal guardians of the students being transported. **No employee may transport any student without written consent from the principal and parent/legal guardian of the student.** 4. **The principal shall** ensure that the driver holds a valid driver's license and liability insurance of $300,000 for a vehicle manufactured up to six (6) passengers or $500,000 for a vehicle manufactured to transport more than six (6) passengers. 5. **The principal must** retain a photocopy of the driver's license and insurance documentation.

*Id.* ¶ 7 (emphasis added).

While Plaintiff served as Burke's principal, she sent staff members to pick up students during school hours in their personal vehicles to drive them to school in the mornings. *Id.* ¶ 8. According to Defendant, Plaintiff violated Section 604.3 because she: (1) failed to verify whether staff members who picked up students held valid licenses and insurance; (2) did not maintain such documentation; and (3) did not receive written consent from parents prior to sending staff members in their personal vehicles to pick up children from their homes. *Id.* ¶ 9. Plaintiff counters that staff

members who picked up students did hold valid licenses and insurance and that she always received parental consent, albeit sometimes parents gave consent verbally or through text message. [114] ¶ 9. Plaintiff concedes that she did not maintain documentation, as required under the policy. *Id.*

### C.  Attendance Policy

Proper attendance coding for CPS students involves coding of: "Present" when a student has received a minimum of 300 instructional minutes; "Half-Day Absent" when a student has received between 150 and 299 instructional minutes; and "Full-Day Absent" when a student has received less than 150 instructional minutes. [99] ¶ 12.

Prior to fall 2017, Plaintiff knew that the Illinois State Board of Education (ISBE) required a certain number of instructional minutes for students per day. *Id.* ¶ 13. All school administrators are responsible for knowing the requirement that a student must receive a minimum of 300 instructional minutes to be considered present. *Id.* ¶ 14. In the CPS attendance software program, "T" means tardy. *Id.* ¶ 15. Students marked tardy receive credit for a fully attendance day ("Present") unless they are so tardy that they receive less than 300 minutes of instruction, in which case they should be marked "Half-day present." *Id.* This requires schools to manually calculate total minutes when a student arrives late or leaves early, and subsequently enter the appropriate attendance code for that student. *Id.*

During the 2016–17 and 2017–18 school years, Tamika Gipson worked as a School Community Representative at Burke and was responsible for tracking

attendance. *Id.* ¶ 27. When Gipson was absent, school clerk Cassandra Abram handled attendance duties. *Id.*

### D.    OIG Investigation

On March 21, 2017, Abram sent a complaint to Defendant's Office of the Inspector General (OIG) stating:

> My name is Cassandra Abram; I am the clerk at Burke Elementary. I have only been staffed at Burke for the 2016-2017 school year. During my short time there, I have noticed (overheard) irregular student attendance practices. Since I am not the person who enters student attendance, I could not confirm the irregular practices, until yesterday (3/20/17), when I was asked to input attendance in the absence of the regular attendance person, Mrs. Gipson. On a regular basis most of the teachers do not enter attendance in grade book. Yesterday I waited until 9:57 a.m. for teachers to enter attendance, at that time only a couple had done so. I texted Mrs. Gipson and ask was this the usual practice, she stated yes and that she enters the attendance from the attendance sheets that the teacher return to the office. I have attached a screen shot of impact at 8:38 a.m. and 9:57 a.m. of un-summited [sic] attendance. I entered and submitted the attendance from the daily attendance sheets and from the tardy sheet (attached). After wards the absence report from Dashboard listed 54 students as absent (attached). As usual the Principal and the Assistant Principal took that list and returned it (marked with the T's) stating that they were able to locate 25 students. I then marked those students tardy in impact with the comment per principal. It is widely rumored thought-out [sic] the school, among the staff that CPS student attendance policies are not followed here at Burke. I know that this is a lot of information, please feel free to contact me 773-655-2448.

[99] ¶ 45.

Following Abrams' complaint, the OIG opened an investigation into Burke's attendance policies. *Id.* ¶ 46. On April 6, 2017, OIG investigator Robert McGowan interviewed Abrams, during which Abrams stated that she overheard Plaintiff instructing Gipson to enter students as tardy or present when she knew the student

to be absent; that Burke staff regularly pick up students at home and bring them to school; and that on March 20, 2017, Plaintiff instructed Abrams to change several students' attendance codes from absent to tardy after walking through the building with assistant principal Hatter. *Id.* ¶ 47.

On May 25, 2017, McGowan interviewed Gipson. *Id.* ¶ 48. During this interview, Gipson reported that she regularly picks students up from their homes in her personal vehicle to bring them to school in the morning. *Id.* Plaintiff told her that doing so was her job responsibility. *Id.* Gipson also said that she was taught that she should mark students who arrive late as tardy, regardless of what time they arrive, and that there are no half-days. [116] ¶ 22.

McGowan interviewed assistant principal Hatter on October 17, 2017. [99] ¶ 49. Hatter admitted that teachers picked up students using their personal vehicles. *Id.*

McGowan then interviewed Plaintiff on February 22, 2018. *Id.* ¶ 50. Plaintiff admitted that she attended lunch hours to verify if students previously marked as absent were present, and that if a student were present at lunch, she changed his or her designation to tardy. *Id.* Plaintiff also admitted that she sent Burke employees to pick students up from their homes and that she received verbal consent from parents to do so. *Id.* Plaintiff also admitted she did not obtain signed authorizations, proof of insurance, or proof of a valid driver's license before employees transported students. *Id.*

On May 14, 2018, the OIG issued a summary report detailing its findings, along with an executive memo, to Defendant and a handful of individuals in CPS

leadership. *Id.* ¶ 51. The OIG reached the following five findings: (1) since the 2014–15 school year, Plaintiff instructed school attendance clerks to mark students arriving late as tardy, regardless of when they arrived at school, and accordingly, ignored CPS' Tardy and Absent classifications based on instructional time a student receives; (2) Plaintiff's improper reliance on the tardy attendance code has likely impacted Burke's attendance rate since the 2014–15 school year; (3) the informal method by which Burke misclassified students as tardy left no formal audit trail, so the OIG could not calculate with certainty the number of instances the school incorrectly designated a student as present and not absent; (4) as part of an initiative to ensure that truant students attend school, Plaintiff regularly instructed several Burke employees to transport students to school in their personal vehicles without following the CPS Student Travel Policy; and (5) Plaintiff undertook these improper actions without the knowledge of Network officials. *Id.* ¶ 51.

### E. Discipline

On June 29, 2018, Defendant terminated Plaintiff and deemed her DNH (Do not Hire). *Id.* ¶ 55. DNH is a designation on an employee's electronic file that prevents that employee from being rehired within CPS. *Id.* ¶ 56.

The same day, Network Chief Sanders sent a letter to parents, the local school council, and Burke community members informing them that the Board removed Plaintiff as interim principal "in response to an investigation by [OIG] that identified improper attendance practices at Burke." *Id.* ¶ 57. The letter also invited people to a

meeting on July 9, 2018 at Burke "to discuss the school leadership change and transition plans." *Id.*

On July 2, 2018, Plaintiff sent a letter to about one hundred community members to tell her side of the story. *Id.* ¶ 58. She emailed the same group twice again on July 3 and 8, encouraging them to attend the July 9 meeting at Burke. *Id.* ¶ 59. On July 6, Plaintiff sent a letter to several members of CPS senior leadership, hoping to overturn their decision to terminate her. *Id.* ¶ 60. She accused OIG of relying exclusively on the testimony of a few disgruntled faculty and staff members and failing to audit physical evidence. [114] ¶ 60. In the letter, she also admitted to having staff members pick up students at their homes without documentation, saying she "did not knowingly or willingly ignore or violate this policy." [99] ¶ 60.

Various staff, community members, parents, Alderman Pat Dowell, and reporters attended the July 9 meeting at Burke; Plaintiff, however, did not attend. *Id.* ¶ 61. Board members Elizabeth Kirby, Felicia Sanders, and Chip Johnson attended. *Id.* Many people asked why Defendant terminated Plaintiff and demanded to see the OIG report. *Id.* ¶ 62. Journalist Sarah Karp attended the meeting and later authored an article quoting Kirby as stating, "It is about integrity. This is about ensuring that anyone in the system in any position really is following policies and procedures that the board has laid out in order to make sure our schools function in a way that is safe and healthy." *Id.* ¶ 63.

On July 13, Defendant's general counsel, Joseph Moriarty, responded to Plaintiff's request to review Defendant's termination decision, advising that its

decision stands. *Id.* ¶ 66. With approval from its communications and legal departments, Defendant decided to release a redacted copy of the OIG report. *Id.* ¶ 65. Defendant held a second meeting on July 25 to address the community's demands for the OIG report and answer questions. *Id.* ¶ 64. During this second meeting, Chief Sanders read aloud the OIG executive summary. *Id.* ¶ 67.

### F.   Plaintiff's Employment After CPS

Defendant does not send its DNH list to any entity, including charter and contract schools. *Id.* ¶ 68. It does, however, administer background checks for its significant vendors, charter schools, and contract schools; during this process, Defendant will disclose DNH status for a candidate undergoing a background check. *Id.* Charter schools need not adhere to the DNH designation. *Id.*

At some point, Ravenswood Elementary School offered Plaintiff an assistant principal position, but Plaintiff could not accept the offer of employment due to her DNH designation. [116] ¶ 37.

Defendant can share DNH designations with prospective employers who contact it for a reference check. [99] ¶ 70. Defendant did not receive any reference check from a prospective employer for Plaintiff, and thus, did not disclose Plaintiff's DNH designation to any prospective employer. *Id.* ¶ 71.

After her termination, Plaintiff looked for principal jobs outside of Chicago but found nothing available in the summer of 2018. *Id.* ¶ 72. She did not apply for any principal positions after that. *Id.* In August 2018, Plaintiff began working for the Judicial Accountability Project—a non-profit that seeks to develop awareness around

judicial elections. *Id.* ¶ 73. Then, starting on November 2018, Plaintiff began working with the Southwest Organizing Project (SWOP) as an organizer and program director. *Id.* ¶ 74. Once Plaintiff gained employment with SWOP, she stopped looking for principal jobs. *Id.* ¶ 72.

In August 2019, Plaintiff started a consulting firm with a colleague, through which she provides leadership, organizational development, and education consulting. *Id.* ¶ 76. At some point, Plaintiff applied for but did not obtain positions at Leading Educators, The Academy Group, The Obama Foundation, and Teach Plus. *Id.* ¶ 77. She did not receive an interview at any of these organizations. *Id.*

### G.    Plaintiff's Complaint

Plaintiff brings a single-count claim against Defendant under 42 U.S.C. § 1983 for violating her Fourteenth Amendment due process rights. [1]. Plaintiff claims that Defendant violated her due process rights by: (1) terminating her without notice and hearing; and (2) infringing on her occupational liberty by publicly stigmatizing her through release of the OIG report and commenting about her termination at public meetings. *Id.* ¶¶ 64–69. Defendant has moved for summary judgment on Plaintiff's due process claim.  [97].

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia, Illinois*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; instead "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. Analysis

Section 1983 creates a private cause of action against any "person" who violates a plaintiff's federal rights while acting under color of state law. 42 U.S.C. § 1983. Under *Monell v. Department of Social Services*, local government units like the Defendant are "persons" under Section 1983. 436 U.S. 658 (1978); *see Khan v. Chi. Bd. Of Educ.*, No. 16 CV 8668, 2022 WL 683748, at *7 (N.D. Ill. Mar. 8, 2022). But because the statute "does not incorporate the common-law doctrine of respondeat superior, . . . a municipality cannot be held liable for the constitutional torts of its

employees and agents." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021), *cert. denied sub nom. First Midwest Bank v. City of Chicago*, 142 S. Ct. 389 (2021). Accordingly, to succeed on her *Monell* claim, Plaintiff must challenge conduct attributable to Defendant itself. *Id.* To do so, Plaintiff must prove the following three elements: (1) the deprivation of an underlying substantive constitutional right; (2) the deprivation can be traced to a municipal action (otherwise known as "policy or custom"); and (3) that this municipal action was the "moving force" behind the deprivation of her substantive constitutional rights. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

As explained below, Plaintiff lacks sufficient evidence to raise a triable issue as to the first two elements: a constitutional deprivation and municipal action. This Court takes these elements in order below.

### A. Constitutional Deprivation

In her complaint, Plaintiff alleges two types of Fourteenth Amendment deprivations: (1) deprivation of her property right to continued employment; and (2) deprivation of her occupational liberty. [1] ¶¶ 64–69.

The parties make no substantive arguments about the former—the alleged deprivation of Plaintiff's property interest in continued employment—so this Court presumes that Plaintiff no longer pursues this theory of relief. Regardless, the record forecloses the viability of this theory. To be sure, when a "public employee has a property interest in his or her job, the constitutional requirements for predeprivation procedures are well-established: notice of the proposed deprivation, a

13

statement of reasons, and an opportunity to be heard in response." *Bradley v. Village of University Park*, 929 F.3d 875, 882 (7th Cir. 2019); *see also Hudson v. City of Chicago*, 374 F.3d 554, 560 (7th Cir. 2004). But state law informs the existence of a cognizable property interest, and under Illinois law, a "public employee has a protected property interest in his job only if continued employment is guaranteed by 'a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him.'" *Catinella v. County of Cook*, 881 F.3d 514, 518 (7th Cir. 2018) (quoting *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007)). Here, the terms of Plaintiff's job did not guarantee continued employment. Instead, she served as an at-will employee for Defendant and therefore could be terminated "at any time and for any reason." *Ponder v. County of Winnebago*, No. 3:20-CV-50041, 2021 WL 3269842, at *5 (N.D. Ill. July 30, 2021). Accordingly, Plaintiff cannot demonstrate a constitutionally protected property interest in her continued employment. *See Cromwell v. City of Momence*, 713 F.3d 361, 366 (7th Cir. 2013) (holding that an Illinois at-will employee did not possess a protected property interest in his job with the police department). This Court grants summary judgment to Defendant on Plaintiff's due process claim to the extent she bases it on a property interest in continued employment.

The bulk of the parties' arguments are directed at Plaintiff's alternative theory that Defendant deprived her of her liberty interest by publicly stigmatizing her in a way that foreclosed future employment opportunities. The Seventh Circuit refers to this as an occupational liberty theory. *See Campos v. Cook County*, 932 F.3d 972, 976

n.2 (7th Cir. 2019) ("An occupational-liberty claim may arise when, after an adverse employment action, a public employer stigmatizes the employee by making public comments impugning his good name, honor, or reputation or imposes a stigma that forecloses other employment opportunities.") (quoting *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010)). To prevail on this theory, Plaintiff must prove: (1) she was stigmatized by Defendant's conduct: (2) the stigmatizing information was publicly disclosed; and (3) she suffered a "tangible loss of other employment opportunities as a result of the public disclosure." *Dupuy v. Samuels*, 397 F.3d 493, 509 (7th Cir. 2005); *see Townsend v. Vallas*, 256 F.3d 661, 669–70 (7th Cir. 2001); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) (noting an occupational liberty claim requires a plaintiff to satisfy the "stigma plus" test, which requires a showing that the defendant inflicted reputational damage accompanied by an alteration in legal status that deprived her of a right she previously held).

The parties debate whether Plaintiff has raised a triable issue on the first two elements of an occupational liberty claim: whether Defendant stigmatized Plaintiff by revealing their reasons for her termination, and whether their statements were sufficiently disclosed to the public at the community meetings. This Court need not resolve these debates, however, because even assuming Plaintiff offers sufficient proof on the first two elements, the record entitles Defendant to summary judgment because Plaintiff lacks evidence on the third element—tangible loss of employment opportunities. To prove Defendant deprived her of tangible employment opportunities, Plaintiff must demonstrate that Defendant has made it "*virtually*

15

*impossible*" for her to find new employment "in [her] chosen profession." *Townsend*, 256 F.3d at 670 (emphasis added). The "removal of one job or employer from the universe of all jobs does not affect occupational liberty." *Blackout Sealcoating, Inc. v. Peterson*, 733 F.3d 688, 690 (7th Cir. 2013). Instead, there "must be a permanent exclusion from or protracted interruption of employment." *Wroblewski v. City of Washburn*, 965 F.2d 452, 456 (7th Cir. 1992).

Initially, the fact that Defendant designated Plaintiff DNH does not in itself prove tangible loss of employment. CPS "is one of many school systems in the metropolitan area and state," and Plaintiff had "many potential employment opportunities [as an educator or school administrator] still available" to her. *Townsend*, 256 F.3d at 671 (quotation omitted). There is no evidence that Plaintiff availed herself of those opportunities; to the contrary, Plaintiff admits she did not apply to any "principal" positions after her termination. [99] ¶ 72. Accordingly, she cannot demonstrate that the DNH status itself foreclosed other similar employment opportunities outside of CPS.

More importantly, for the purposes of her occupational liberty claim, Plaintiff cannot prove, as she must, that Defendant's *public statements* (not just the DNH designation) caused the loss of future employment prospects. *See Dupuy*, 397 F.3d at 509 (explaining that the tangible employment loss must be the "result of the public disclosure"). Plaintiff points to the fact that she was offered but could not accept an assistant principal position at Ravenswood Elementary School. [121] at 21–22; *see* [116] ¶ 37. The evidence, however, does not show that Defendant's "public disclosure"

16

of stigmatizing information caused her to lose out on this job opportunity. *Dupuy*, 397

F.3d at 509. Rather, Plaintiff admits she could not accept that position because the

position required her to serve at a CPS school and she could not serve at a CPS school

due to her DNH status with CPS. [116] ¶ 37.

Plaintiff also points to the declaration of Sarah Adams, a managing director of

LEARN, a network of college prep public elementary schools. [121] at 21; [116] ¶ 35;

[117-8]. According to Adams, Plaintiff applied for a director of operations position

with LEARN in August 2018, but during her interviews, LEARN signed or was

negotiating a memorandum of understanding (MOU) with CPS prohibiting LEARN

from hiring anyone on CPS' DNH list. [117-8] ¶ 5. Although Plaintiff relies heavily

on Adams' declaration to establish the disputed fact that she could not get hired after

her termination, the declaration is inadmissible and immaterial. It is inadmissible

because Plaintiff did not disclose Adams as a witness during discovery. *See* [125] ¶

35; [125-1]. Federal Rule of Civil Procedure 26(a) requires a party to disclose the name

of "each individual likely to have discoverable information." If a party fails to do so,

she "is not allowed to use that . . . witness to supply evidence on a motion . . . , unless

the failure was substantially justified or is harmless." *King v. Ford Motor Co.*, 872

F.3d 833, 838 (7th Cir. 2017) (first quoting Fed. R. Civ. P. 37(c)(1); then quoting *David

v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)). Plaintiff provides no

justification for her failure to disclose Adams, and such failure cannot be described

as harmless because it prevented Defendant from deposing Adams or conducting

"appropriate follow-up discovery." *Id.* Adams' declaration thus is inadmissible under Rules 26 and 37.

Aside from the admissibility issues, Adams' declaration is immaterial because it does not raise a triable issue as to whether Defendant's *public statements* caused Plaintiff to lose out on job opportunities. Adams states that it was her understanding that the MOU between LEARN and CPS precluded Plaintiff from advancing in the interview process. She does not, however, say how LEARN became aware of Plaintiff's DNH designation so as to raise a reasonable inference that *Defendant* provided that information. The undisputed evidence reflects the contrary: Defendant did not receive any reference checks from any prospective employers for Plaintiff and therefore did not disclose Plaintiff's DNH designation to any prospective employer. [99] ¶ 71. No rational jury could find for Plaintiff on the basis of this evidence. *See Townsend*, 256 F.3d at 671–72 (affirming summary judgment where the plaintiff failed to demonstrate that school board's public comments prevented him from obtaining a job); *see also, e.g.*, *Messina v. Village of Villa Park*, No. 13 C 00405, 2015 WL 4423579, at *6 (N.D. Ill. July 20, 2015) (finding that a complaint failed to allege the third element because the allegations indicated that plaintiff was turned down for a position because his prospective employer conducted a background check and had conversations with his old employer, and not because the prospective employer viewed a blog post that contained stigmatizing information regarding plaintiff).

Additionally, Plaintiff's occupational liberty theory fails because a "liberty interest in pursuing a career in the field of one's choosing does not vest [Plaintiff]

with a right to have the same job, or the same salary, or the same employer." *Wood v. Peoria Sch. Dist. 150*, 162 F. Supp. 3d 786, 795 (C.D. Ill. 2016) (citing *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985)). Plaintiff did not have trouble finding employment in the field of education after her termination. Only about one month after her termination, in August 2018, Plaintiff started work at a non-profit for judicial elections. [99] ¶ 73. This was not a job in Plaintiff's chosen field of education, but Plaintiff secured a job in the education field only a few months later. In November 2018, Plaintiff began working for SWOP as an organizer and program director. *Id.* ¶ 74. According to Plaintiff, her role at SWOP involves managing a collaborative of nine social services, healthcare, and behavioral health organizations, and four local schools. [114] ¶ 74. And less than a year later, in August 2019, Plaintiff started a consulting firm with a colleague, through which she provides leadership, organizational development, and education consulting. [99] ¶ 76. In sum, the record demonstrates that Plaintiff has been able to work in the field of education; she has not "been permanently excluded from [her] field, nor has [her] economic activity in that field been interrupted for a protracted period." *Chi. United Indus., Ltd. v. City of Chicago*, No. 05 C 5011, 2007 WL 4277431, at *7 (N.D. Ill. Dec. 3, 2007). As Plaintiff points out, her roles in those two jobs—SWOP and her consulting firm—are not administration jobs in schools. *See* [121] at 21. But occupational liberty "only provides the right to a chosen occupation, not to a 'specific job.'" *Gyrion v. City of Chicago*, No. 04 C 5670, 2006 WL 1302414, at *2 (N.D. Ill. May 4, 2006) (quoting *Wroblewski,* 965 F.2d at 455). The fact that Plaintiff still works in the education field and with schools

19

undermines the notion that Defendant has caused her the inability to find work in her field. *See Wroblewski,* 965 F.2d at 455–57 (holding that the plaintiff, a Wisconsin marina manager, failed to state an occupational liberty claim when the defendant municipality "effectively prevented [him] from obtaining *any* potential employment or subcontracting work in connection with [its] marina," which "required [him] to leave Wisconsin for a period of time to obtain employment," because those actions did not subject him to a "permanent exclusion from" employment in his occupation); *compare, e.g.*, *Dupuy*, 397 F.3d at 503 (finding that "placement of an individual's name on the [Illinois Department of Child & Family Services'] central register does more than create a reputational injury. It places, by operation of law, a significant, indeed almost insuperable, impediment on obtaining a position in the entire field of child care.").

For these reasons, Plaintiff has not created a genuine issue of material fact as to the third element of an occupational liberty claim—the tangible loss of employment opportunities. Accordingly, Plaintiff also fails to prove a constitutional deprivation, the first element of a *Monell* claim. Summary judgment is proper on this basis alone.

### B. Municipal Action

Summary judgment is also warranted on Plaintiff's *Monell* claim because Plaintiff has failed to raise a triable issue on the element of municipal action.

Municipal action exists in three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so "permanent and well-settled that it constitutes a custom or practice"; or (3) a

constitutional injury caused by a person with final policymaking authority. *First Midwest*, 988 F.3d at 986 (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). Here, the record contains no evidence of an express policy. Nor has Plaintiff adduced any evidence "of a pattern or practice of similar violations." *Dean*, 18 F.4th at 237. Accordingly, the first two forms of municipal action do not apply here.

That leaves Plaintiff to pursue the official policymaker variant of municipal action. Plaintiff contends that she has identified Defendant's CEO, Janice Jackson, as a final policymaker concerning termination of interim principals. [121] at 2. Plaintiff emphasizes the fact that Defendant admitted that "Jackson is a final policy- or decision-maker for [Defendant] with respect to termination of employees of [Defendant] working as interim principals." *Id.*; *see* [14] ¶ 6. It is insufficient, however, for Plaintiff to establish that Johnson acted as a final policymaker with respect to Plaintiff's termination. As discussed above, as an at-will employee, Plaintiff had no property interest in continued employment. Accordingly, it is irrelevant that Johnson acted as a final policymaker on termination decisions.

Nor does Plaintiff present any evidence that an official policymaker caused her alleged occupational liberty deprivation. To meet her summary judgment burden, Plaintiff must offer evidence that her alleged constitutional injury—the stigma imposed on her through Defendant's public statements—"was caused by an individual with final policymaking authority with *respect to the subject matter in question*." *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009) (emphasis added). Plaintiff asks this Court to infer that Jackson acted as Defendant's final

21

policymaker on "public statements" because she was also the final policymaker on terminations. [121] at 3. Yet employment is an entirely different subject matter than public statements; the fact that Jackson had policymaking authority over employment decisions does not necessarily mean she had the "independent authority" to make public statements, let alone the "authority to set general policy on this issue." *Milestone v. City of Monroe*, 665 F.3d 774, 781 (7th Cir. 2011).

Plaintiff offers evidence in the form of email exchanges that purportedly "show Jackson coordinating with her staff to handle their response to the public outcry over [Plaintiff]'s termination." [121] at 3 (citing [116] at 2). This Court has reviewed those email exchanges and finds they do not reflect that Jackson coordinated with her staff on public statements. They contain no statements from Jackson herself, and nothing in the email exchanges indicate that Jackson possessed policymaking authority on the issue of public statements. *See* [100-5]; [117-6]. Equally unsuccessful is Plaintiff's attempt to use Defendant's privilege log to show that Jackson and her staff conducted "extensive consultations with counsel" regarding Burke, the OIG report, and the community meetings. *Contra* [121] at 4. The privilege log is inadmissible hearsay to the extent Plaintiff offers it for the truth of the matters contained in the log entries— that is, that senior staff communicated with counsel about the OIG report and community meetings. *See Siemens v. Seagate Tech.*, No. SACV 06-788JVS ANX, 2009 WL 8762978, at *8 (C.D. Cal. Apr. 27, 2009). Putting aside the admissibility issues, the privilege log entries also do not say anything suggesting that Jackson possessed final policymaking authority with respect to public statements. *See* [117-7].

Even assuming Plaintiff's proffered evidence sufficed to show that Jackson acted as a final policymaker with respect to public statements, Plaintiff must also show that Jackson displayed deliberate indifference to the known or obvious consequences of her conduct. *Turner v. Paul*, 953 F.3d 1011, 1017 (7th Cir. 2020); *see also Doe v. Vigo County*, 905 F.3d 1038, 1045 (7th Cir. 2018). The record contains no evidence from which a reasonable jury could conclude that Jackson—or any other representative of Defendant—knew that making public statements would pose a "substantial risk" to Plaintiff's occupational liberty. *Wragg v. Village of Thornton*, 604 F.3d 464, 469 (7th Cir. 2010) (quoting *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000)).

For these reasons, Plaintiff also fails to raise a triable issue of fact on the "municipal action" element of her *Monell* claim under Section 1983. Summary judgment is warranted on this basis as well.

## IV. Conclusion

For the reasons explained above, this Court grants Defendant's motion for summary judgment [97]. The Clerk is directed to enter judgment for Defendant and against Plaintiff. Civil case terminated.

Dated: May 19, 2022

Entered:

Mary M. Rowland
United States District Judge

23